## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DONALD PINNOCK, et al.,**

                **Plaintiffs,**

**vs.**                                            **Civ. No.  14-293 JCH/WPL**

**BOARD OF COUNTY COMMISSIONERS**
**OF GRANT COUNTY, et al.,**

                **Defendants.**

## MEMORANDUM OPINION AND ORDER

       This matter is before the Court on *Defendants' Motion To Dismiss The Complaint For Failure To State A Claim, Or In The Alternative, For Summary Judgment* [Doc. 55]. In a previous Memorandum Opinion and Order [Doc. 93], the Court deferred ruling on this motion because it permitted Plaintiffs to name a new jail procedures expert, Dr. Richard G. Kiekbusch, to replace Plaintiffs' original expert, who withdrew from the case due to health problems. In order to cure any prejudice to Defendants, the Court permitted them to (1) depose Kiekbusch outside of the discovery period, (2) give Defendants' jail procedures expert an opportunity to amend his or her expert report based Kiekbusch's report and deposition testimony, and (3) file a supplemental brief in support of the above-mentioned motion to dismiss.

       In accordance with the deadlines set by the Magistrate Judge [*see* Doc. 107], on June 20, 2016, Defendants filed their supplemental brief in support of their motion. Doc. 116. On July 7, 2016, Plaintiffs filed their response [Doc. 117], and on July 18, 2016 Defendants filed their reply. Doc. 119.

## PARTIES AND PROCEDURAL HISTORY

Plaintiffs are the family members of decedent Jonathan Michael Everage and the Personal Representative of his estate. Everage killed himself while in custody at the Grant County Detention Center in March of 2012. Doc. 71. The Defendants are Grant County, Grant County Sheriff Raul Villanueva, Deputy Sheriff Manuel Maldonado, Corporal William Mize of the Grant County Sheriff's Department, and Grant County Jail Administrator Mike Jimenez. Doc. 71. Other than Grant County, Plaintiffs are suing all Defendants in both their individual and official capacities. Doc. 71 at ¶ 5-9.

In their Amended Complaint, Doc. 71, Plaintiffs assert five claims against Defendants. In Count I, Plaintiffs assert a claim against all Defendants under 42 U.S.C. § 1983 for violation of Everage's Fourteenth Amendment due process rights to be free from cruel and unusual punishment. In Count II, they assert a claim for "respondeat superior" against Grant County only. In Count III, Plaintiffs assert a claim of negligence against all Defendants.[1] Counts V and VI, brought against Grant County and Sheriff Villanueva, are for negligent supervision and negligent training, respectively.

## LEGAL STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect

---

[1] In Count IV, Plaintiffs asserted a claim of prima facie tort against the individual Defendants. Plaintiffs have withdrawn that claim. *See* Doc. 67 at 39.

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g., Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. Qualified immunity bars Section 1983 suits against defendants in their individual—but not official—capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officers' conduct violated a constitutional right. *Cf. id.* at 201. The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).  A right is clearly established when it is "sufficiently clear that every

4

reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, ⸺ U.S. ⸺, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks and alteration omitted). To make this determination, the Court considers "either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct at issue." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008) (emphasis added). Usually, this requires either "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cordova v. City of Albuquerque*, 816 F.3d 645, 658 (10th Cir. 2016) (quoting *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010)).

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity. *See Medina*, 252 F.3d at 1128. If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)). In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina*, 252 F.3d at 1128 (citation omitted). However, if the nonmoving party successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted).

<u>**UNDISPUTED MATERIAL FACTS**</u>

Unless otherwise noted the following facts are undisputed, based upon the briefs and evidence filed by the parties.

**I.**     <u>**Everage's Arrest and Detention**</u>

On March 20, 2012, Defendant Manuel Maldonado was a Deputy Sheriff of Grant County. On that date, Liz Carver made a 911 call regarding a domestic disturbance at her home. Carver told the dispatcher that Jonathan Everage was yelling "Shoot me, shoot me!" Doc. 67-1. Carver stated that Everage used to live with her, but she had kicked him out. *Id*. She also told the dispatcher that Everage had tried to hang himself in October of 2010, and that "he could be in the garage hanging." *Id*. Maldonado responded to the call, along with Defendant William Mize of the Grant County Sheriff's Department and New Mexico State Police Officer Daniel Soliz.[2]

When law enforcement officers arrived at Carver's home, she repeated the statements she had made to the dispatcher. Carver told Maldonado that Everage had been drinking beer and caused property damage to her home, breaking windows with an axe. On video taken from Maldonado's lapel camera, [Defts' Ex. O to Doc. 55, Lapel Cam video], Carver can be seen and heard telling officers: "He [Everage] said, 'Shoot me, shoot me!'", while he was attempting to break through the windows. At a later point in the interview, Carver told the officers "He wants to die." She also informed them that Everage had hung himself in her garage in October of 2010, and that she feared that Everage might try to hang himself in her garage again. Soliz and Mize were present when Carver made these statements to Maldonado. Carver also tells the men that Everage is on several medications, which she describes as heart pills, Lexapro, a mood stabilizer, and an anti-anxiety medication. Later, she shows the officers the bottles containing Everage's

---

[2] Neither Soliz nor the New Mexico State Police are defendants in this case.

6

daily medications and describes them as "three psych drugs" and "heart medication." Shortly thereafter, the officers arrested Everage, who was intoxicated. Everage himself did not tell the officers that he was suicidal. Doc. 67-2 at 72.

Officer Soliz of the New Mexico State Police took Everage to the Gila Regional Medical Center. Personnel at that hospital gave Everage a medical clearance to be booked into jail. Doc. 55-4. The doctor's note states that Everage has received a medical screening examination in the emergency room, his vital signs are stable, and he is cleared for discharge from the Emergency Department. *Id*. The discharge does not state whether or not doctors at Gila Regional Medical Center performed a mental health screen on Everage. *Id*.; Doc. 67-5. Everage's medical discharge form contains no special instructions with regard to prescriptions, medications, mental disorders, or suicide watch. *Id*.

Defendant Maldonado transported Everage from the hospital to the Grant County Detention Center ("GCDC") for booking. It was jail policy for the Receiving Officer to fill out an Inmate Medical Screening Form with the inmate by asking the inmate the questions on the form. Maldonado stood next to Everage while the Receiving Officer asked Everage the questions on the Inmate Medical Screening Form, and he did not contradict Everage when he told the Receiving Officer that he was not suicidal. Doc. 67-2 at 69-70. As filled out by the Receiving Officer, Everage's answers to questions on the Medical Screening Form indicate that he answered "Yes" to the following questions: whether he takes medications on a regular basis; whether he had consumed alcohol in the last 24 hours; prior hospitalization for mental illness in October 2010; prior suicide attempt in October 2010; high blood pressure or heart disease; and whether he had a primary care physician. Doc. 55-6; Aguirre Depo., Doc. 67-6 at 52. Everage answered "No" to the following questions: whether he had any health-related complaints;

contagious illnesses; had ever gone through alcohol withdrawals; was under the influence of drugs; had been in an altercation in the last 24 hours; had ever been treated for TB, had diabetes; had asthma; was currently pregnant; or suffered from epilepsy or seizures. Doc. 55-6. The form also notes that Everage has no medical prescriptions from the hospital. *Id*.

According to GCDC employee Brawn Aguirre, Everage was booked into the jail's general population and was allowed to keep the shoes he was wearing at the time of his arrest. Aguirre Depo., Doc. 55-5 at 72, 100. Jail administrators did not place Everage on suicide watch or refer him to mental health services. Defendant Maldonado filled out and Aguirre signed an Arrest/Booking Report for Everage [Doc. 55-9] that indicated that he was under a doctor's care and/or taking medication. However, the Inmate Property Inventory List for Everage (Doc. 67-9) lists no medications that GCDC may have received with Everage when he was booked. The record contains no documentation from GCDC concerning what medications Everage had been receiving at the time of his arrest and intake at GCDC, nor any logs showing what medications Everage may have received while he was detained.

On March 27, 2012, seven days after he entered the jail, Everage hung himself in his cell using the shoe laces from his street shoes. *See* Doc. 55-7. He died at the hospital the following day.

## II.   <u>Grant County Jail Policies and Procedures</u>

The Deputy Administrator of the Grant County Detention Center ("GCDC"), Joseph Andazola, testified that at the time of Everage's detention, the Grant County Detention Center policy was to take a detainee to a hospital for medical clearance prior to booking them into the jail if the detainee arrived carrying medication or if the detainee stated he took prescribed medication. Andazola Depo. at 25. It was also policy to place a detainee on suicide watch if he

claimed to be suicidal. However, because Everage did not claim to be currently suicidal at his booking, he was not placed on suicide watch. Aguirre Depo., Doc. 55-5 at 39-40, 53. For inmates who stated at intake that they were suicidal or who were otherwise on suicide watch, the jail called Border Area Mental Health Services to evaluate them. Andazola Depo., Doc. 55-3 at 41; *see also* Deposition of Defendant Michael Jimenez, former GCDC administrator, Doc. 55-8 at 97-98. Further, it was GCDC policy for jail employees to follow up with additional questions if information on the Arrest/Booking Report indicated that the detainee was under a doctor's care and/or taking medication; in that event, jail employees were supposed to find out what further medical attention or medication the inmate needed and take action. Jimenez Depo., Doc. 55-8 at 69, 73. In Everage's case, his Arrest/Booking Report did indicate that he was under a doctor's care and/or taking medication. Doc. 55-9. In addition, if an inmate displayed mental health issues while at the jail, the employees would make an appointment for him with Border Area Mental Health. Doc. 55-5 at 73-74; Jimenez Depo., Doc. 55-8 at 98. If an inmate was seen by a mental health professional who required a certain medical protocol for that patient, the GCDC would follow that protocol. Jimenez Depo., Doc. 55-8 at 83. However, because GCDC never referred Everage to see a mental health professional, there was no protocol in place for him.

According to GCDC policy, any detainee requesting medical care must be taken to a nearby clinic. Andazola Depo., Doc. 55-3 at 39-40; Jimenez Depo., Doc. 55-8 at 64-65. The GCDC Policy and Procedure Manual in place at the time of Everage's detention stated that the facility should have a Medical Director and a contract with a psychiatric agency to provide mental health care on an on-call basis [Doc. 67-12 at 0000290]; however, neither of these safeguards was in place at that time. Andazola Depo., Doc. 67-8 at 40-41. GCDC policy required employees to fill out daily Medication Prep Sheets for the inmate population; these were filled

out by medical staff when they saw an inmate, or prescribed him medicines, or if the inmate had medications in the facility. Aguirre Depo. at 78-79. GCDC staff used the Medication Prep Sheets to keep track of medications that needed to be filled or that were distributed to inmates. *Id*. The staff also noted whether the inmate took the medicine or refused it. *Id*.

An MP sheet dated March 22, 2012 states: "Re-fill ordered for Inmate Everage." Doc. 55-10. A Pass Down Log dated March 25, 2012 states: "Schedule apt. for inmate Everage, Jonathan for medication scripts." Doc. 55-11. Another copy of this same document has a check mark next to the notation regarding Everage and handwritten notes: "Copper Med," "3.30," "1000." Doc. 55-12. Another Pass Down Log dated March 26, 2012—the day before Everage hung himself—states: "Appt made for Inmate Jonathan Everage at Copper Med on 3/30/12 @ 1000." Doc. 55-13. It is undisputed that GCDC had policies in place regarding the identification, storage, oversight, and distribution of prescriptions to detainees. Again, however, there is no evidence that GCDC received or obtained medication for Everage, or ever dispensed any medication to him.

## DISCUSSION

As described above, Plaintiffs have elected to sue each of the Defendants in both their individual and official capacities. When a governmental official is sued in his official and individual capacities for acts performed in each capacity, those acts are "treated as the transactions of two different legal personages." *Bender v. Williamsport Area Sch. Dist*., 475 U.S. 534, 543 n. 6 (1986) (internal quotation marks omitted). Thus, a person sued in his official capacity has no stake, as an individual, in the outcome of the litigation. *Id*. at 543-44. Personal or individual capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law," while an official capacity suit is "only another way of

pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks omitted). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," and not as a suit against the official personally, "for the real party in interest is the entity." *Id.* at 166, 105 S.Ct. at 3105. Thus, the Court will treat Plaintiffs' official capacity claims against Villanueva, Maldonado, Mize, and Jimenez as claims against Grant County.

**I.      Violation of Fourteenth Amendment Rights Under § 1983 (Count I)**

Initially, Defendants moved to dismiss Count I for failure to state a claim. Doc. 55 at 8. Defendants based their motion to dismiss on the original Complaint, which asserted that Everage's Eighth Amendment rights were violated. *See* Doc. 1 at ¶¶ 30-31. Defendants pointed out that the Eighth Amendment does not apply to pretrial detainees such as Everage. *See* Doc. 55 at 8. Then, Plaintiffs amended Count I to state a claim for violation of Everage's Fourteenth Amendment rights, thereby rendering moot Defendants' motion to dismiss Count I on that basis. Therefore, the Court turns to the portion of Defendants motion asserting that they are entitled to summary judgment on Count I.

The federal courts have examined the constitutional rights of prisoners who commit or attempt to commit suicide while in state custody. Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners[, t]hey are, ... responsible for taking reasonable measures to [e]nsure the safety of inmates." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted). Accordingly, a jailer violates the Eighth Amendment if he shows deliberate indifference to a convicted inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 834

(1994). "Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment." *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992); *see also Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979).

Claims arising from a failure to prevent prisoner suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997). Thus, a plaintiff bringing such a claim must prove that his jailer was "deliberately indifferent to a substantial risk of suicide." *Id*. at 869 (internal quotation marks omitted). "Deliberate indifference has objective and subjective components." C*allahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of the test is met if the harm suffered was sufficiently serious. *Id*. There is no dispute that suicide satisfies this requirement. *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that suicide is a serious harm."). *See also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (observing that death, "without doubt," is "sufficiently serious to meet the objective component") (citation omitted).

The subjective component of the test requires a showing that the defendant acted with a culpable state of mind. In *Farmer v. Brennan*, the Supreme Court observed that the required *mens rea* lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other . . . ." 511 U.S. at 836. The Court then held that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. The Court made clear that the defendant's knowledge of a substantial risk may be proven by

circumstantial evidence, including evidence "that the risk was obvious." *Id.* at 842. "However, the threshold for obviousness is very high." *Gaston v. Ploeger*, 229 Fed. Appx. 702, 710 (10th Cir. Apr. 12, 2007) (unpublished).

### A.       Defendants Maldonado and Mize Assert Qualified Immunity[3]

Defendants Maldonado and Mize (the arresting officers) move for summary judgment on Plaintiffs' claim for violation of Everage's Fourteenth Amendment rights on the grounds that they are entitled to qualified immunity. As set forth above, by raising this defense the Defendants shift the burden to Plaintiffs to (1) demonstrate facts which, if true, would constitute a violation of Everage's constitutional right, and (2) show that the right was clearly established at the time such that a reasonable person in the Defendants' position would have known that the conduct violated the right. As a matter of law, if a plaintiff fails to meet either burden, then the defendant is entitled to qualified immunity. *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009).

### 1.       *Maldonado and Mize's Actions*

Viewed in the light most favorable to Plaintiffs, the facts regarding Maldonado and Mize's actions are that Maldonado and Mize responded to an emergency call from Carver at her residence. When they arrived, Carver told Maldonado and Mize that Everage had caused property damage to her home. Carver told them: "He [Everage] said, 'Shoot me, shoot me!'", and "He wants to die." She also informed them that Everage had hung himself in her garage in October of 2010, and that she feared that Everage might try to hang himself in her garage again.

---

[3] In the motion [Doc. 55], Grant County Jail Administrator Mike Jimenez and Grant County Sheriff Raul Villanueva do not move for summary judgment based on qualified immunity. Confusingly, these Defendants appear to belatedly argue in their reply brief [Doc. 75 at 5-6] that they are entitled to qualified immunity due to lack of clearly established law on the right to be properly screened for suicidal tendencies. As this argument was not raised in the motion itself, the Court does not address it here.

Carver also told them that Everage was on several medications, which she describes as heart pills, Lexapro, mood stabilizers, and anti-anxiety medication. Carter showed the officers the bottles containing Everage's daily medications and described them as "three psych drugs" and "heart medication." After Everage was arrested and cleared by the hospital to go to jail, Maldonado transported Everage from the hospital to the GCDC for booking and stood next to Everage while the Receiving Officer asked Everage the questions on the Inmate Medical Screening Form. Maldonado did not contradict Everage or interject when Everage told the Receiving Officer that he was not suicidal and that he had not been in an altercation that day. The record contains no evidence that Mize was ever present at the jail.

### 2. *Qualified Immunity Analysis*

The Court begins its discussion of Maldonado and Mize's qualified immunity defense, inquiring whether (1) defendants acted with deliberate indifference to Everage's serious medical needs, and (2) the law at the time of the incident was sufficiently clear that a reasonable official in Maldonado and Mize's position would have understood that his conduct violated Everage's constitutional right. *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). More specifically, the question raised by the second prong is whether in March of 2012, clearly established law would have given Maldonado and Mize fair warning that their conduct violated Everage's Fourteenth Amendment due process rights by showing deliberate indifference to his serious medical needs. *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015).

First, the Court concludes that Maldonado and Mize did not violate any constitutional duty to Everage. Unfortunately, Plaintiffs do not make clear what action or inaction by Maldonado and Mize allegedly violated Everage's constitutional rights. Both Defendants responded to the scene at Carver's home, and Maldonado transported Everage to GCDC after he

14

had been discharged from the hospital. However, Everage did not kill himself while in the custody of either of these two Defendants, but rather a week after being booked into the jail. There is no evidence in the record that either Maldonado or Mize is a "jailer" with the power to decide whether to place a GCDC detainee like Everage on suicide watch or to refer him to mental health services. There is no evidence that would support an inference that Maldonado or Mize had a duty to attend to Everage's medical needs during the week he spent at GCDC prior to his suicide. Plaintiffs do suggest that Maldonado and Mize's unconstitutional actions stem from their failure to (1) dispute Everage's assertion that he was not suicidal; (2) inform the intake officer that Carver told them that Everage had said "Shoot me! Shoot me!" and of Carver's belief that Everage was currently suicidal; (3) inform the intake officer what medications Everage had been taking; and (4) dispute Everage's assertion that he had not been in an altercation that day by telling him about the fight between Carver and Everage. *See* Doc. 67 at 12-13, 20-21; *see also* Doc. 67 at 28 ("[T]he arresting officer and the Grant County jail personnel failed to act despite their knowledge of a substantial risk of serious harm.").

The undisputed evidence shows that while a third party, Carver, reported suicidal behavior and statements by Everage to Maldonado and Mize, Everage himself did not make those statements to the officers. Maldonado Depo., Doc. 67-2 at 71. In fact, Everage denied being suicidal. Although Carver reported to Maldonado and Mize that Everage had made a previous suicide attempt, that attempt was not recent, but rather had occurred a year and a half prior to his arrest. Furthermore, before Maldonado took Everage to the jail, the hospital had medically cleared Everage. Though Plaintiffs argue that the medical clearance did not include a psychological evaluation—and therefore seem to imply that Maldonado could not rely on that clearance—there is no evidence in the record to show that Maldonado or Mize knew that the

hospital had not conducted a psychological examination. In addition, with regard to Mize, any duty to make a report to jailers regarding Everage's medications, use of alcohol, and his statements to Carver is even more doubtful because Mize was not present at booking and therefore had no opportunity to inform the booking officer of the night's events. In view of this evidence, the Court concludes that neither Maldonado nor Mize acted with deliberate indifference to a serious risk of suicide by Everage while he was in GCDC.

In addition, Plaintiffs point to no clearly established law that would have placed Maldonado or Mize on notice that in failing to take the above actions they were violating Everage's constitutional rights. Plaintiffs cite no law that suggests that Maldonado could not rely on the hospital's medical clearance and had an affirmative duty to determine whether the hospital had conducted a psychological evaluation on Everage. Plaintiffs cite no law requiring Maldonado and Mize to bring Everage's medications to the jail, or to report to the intake officer the exact names and dosages of his medications. Finally, Plaintiffs cite no clearly established law that would have placed Maldonado on notice that he was violating Everage's constitutional rights by failing to contradict Everage during his booking interview. The cases Plaintiffs relies upon to show that the law was clearly established refer only to the duties of "jailers," or "prison officials," but Maldonado and Mize are neither. *See, e.g., Estelle*, 429 U.S. at 98 (addressing liability of prison medical director, warden, and director of corrections department); *City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239 (1983) (finding that a city fulfilled its constitutional duty by taking arrestee injured by police to the hospital promptly); *Barrie v. Grand County, Utah*, 119 F.3d 862 (1997) (addressing liability of jail employees to inmate, not arresting officers). With regard to Mize, Plaintiff cites no clearly established law placing a law

enforcement officer who is not present at booking to make that sort of report to jail employees, and the Court is aware of none.

In fact, there are similar cases that suggest Maldonado and Mize had no such affirmative duty to pass on information about Everage's past suicide attempt to the jail employee conducting the screening. For example, in *Williams v. West Chester*, 891 F.2d 458, 462 (3d Cir. 1989), the court concluded that a police dispatcher who knew of a detainee's past suicide attempts but did not pass this information on to the police, despite being present when the detainee arrived at the police station, did not violate with deliberate indifference the rights of the detainee, who later killed himself in his cell. The court noted that dispatchers (like arresting officers in this case) have no responsibility for the care of prisoners. *Id*. at 466-67. Similarly, in *Freedman v. City of Allentown*, 853 F.2d 1111, 1113 (3d Cir. 1988), another Third Circuit case, the court concluded that a detainee's probation officer who knew but failed to inform the jail of the detainee's past suicide attempts did not act with deliberate indifference; rather, the probation officer's actions were merely negligent and not the sort of abusive government misconduct that the due process clause was designed to prevent. *Id*. at 1117. Under these circumstances, the Court concludes that the law was not clearly established that Maldonado or Mize violated Everage's due process rights.

Accordingly, the Court concludes that Maldonado and Mize are entitled to qualified immunity on Count I.

### B.    Supervisory Liability of Jimenez, Villanueva, and Grant County

#### 1.    *Individual Capacity Claims*

As noted above, Defendants Jimenez and Villanueva do not assert qualified immunity with regard to Plaintiffs' constitutional claim. They do move for summary judgment under Rule

56, however. Doc. 55 at 13 ("the defendants are entitled to summary judgment in their favor on Count I of the Complaint."). These Defendants appear to assume that Plaintiffs' claims against them are for supervisory liability only. This assumption is not illogical, given the lack of evidence in the record of any personal knowledge or direct involvement by Jimenez and Villanueva in the intake screening process, as well as the decisions to house Everage in the general inmate population, leave him in street shoes, and not send him for a psychological evaluation during his time at GCDC. Thus, like the Defendants, the Court infers that Plaintiffs' allegations are that Jimenez, Villanueva, and Grant County failed to properly train and supervise the jail employees responsible for Everage during his time at GCDC. Count II of Plaintiffs' Amended Complaint [Doc. 71] supports this inference. Titled "Respondeat Superior," Count II contains allegations that Grant County and Villanueva are responsible for the hiring, training, instruction, supervision, and discipline of Maldonado, Mize, and Jimenez. *Id*. at ¶ 34.

It is well established that government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). However, Section 1983 does allow a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement of which causes the plaintiff to be deprived of any constitutional right. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). It is this type of claim that Defendants and the Court infer that Plaintiffs are asserting in Count II. See Doc. 67 at 35-36. In order to prove supervisory liability under § 1983, a plaintiff must show: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a

policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.*

Here, Plaintiffs do not present evidence that Everage displayed suicidal behavior or expressed suicidal ideation during the seven days he was in GCDC that should have placed Defendants on notice that he was a suicide risk. Plaintiffs assert that Defendants "failed to observe or record behaviors which would indicate mental illness," [Doc. 67 at 36], but that assertion, without supporting evidence, does not create a genuine issue of material fact. Rather, the crux of Plaintiffs' argument is that jail officials improperly screened Everage for suicide risk at intake [Doc. 67 at 26, 36], which then led to the decisions to place him in an unsupervised cell and allow him to keep his street shoes.[4]

First, the Court notes that it is unclear that an inmate possesses a constitutional right to be properly screened for suicide. Recently, in *Taylor v. Barkes*, — U.S. —, 135 S. Ct. 2042 (2015), while resolving a deliberate indifference dispute on the "clearly established law" prong of the qualified immunity standard, the Supreme Court held that, as of November 2004, there was no clearly established "right" of an inmate to be adequately screened for suicide. *Taylor*, 135 S. Ct. at 2044-45. The Court noted that "[n]o decision of this Court even discusses suicide screening or prevention protocols." *Id.* at 2044. A few months later, the Tenth Circuit found that this state of the law had not changed as of 2009. *See Cox v. Glanz*, 800 F.3d 1231, 1250-51 (10th Cir. 2015). In fact, the Court is aware of no legal precedent in this Circuit which holds that a jail's

---

[4] To the extent that Plaintiffs' Amended Complaint and response to the motion can be read to assert a claim that the jail Defendants were deliberately indifferent to Everage's serious medical needs by failing to ensure he was properly medicated, Defendants are entitled to summary judgment because Plaintiffs have presented no evidence that a lack of medication was a cause of Everage's suicide.

nonexistent or deficient suicide-screening measures would, in and of itself, give rise to a constitutional claim.

Rather, the law in the Tenth Circuit requires a showing by Plaintiffs that Defendants Jimenez and Villanueva acted with deliberate indifference to a known, substantial risk that Everage would commit suicide. As neither Jimenez nor Villanueva interacted directly with Everage, any knowledge necessary for these defendants to form the requisite mental state would have had to come from their subordinates, none of whom are named parties in this case. Here, Everage told the intake officer that he took medications on a regular basis, had consumed alcohol in the last 24 hours, had been hospitalization for mental illness, and had a prior suicide attempt. Doc. 55-6. Importantly, he told the intake officer that the suicide attempt and hospitalization had occurred a year and a half earlier. There is no evidence that the intake officer knew what the medications were or what they were for. Everage denied having any health-related complaints, having ever gone through alcohol withdrawals, being under the influence of drugs, and having been in an altercation in the last 24 hours. He also denied being suicidal at the time of booking. Everage also had been medically cleared for jail by the hospital. The Arrest/Booking Report, signed by an unknown "Receiving Official" who may or may not have been the same person who administered the intake questionnaire, states that Everage has a known history of alcoholism and mental illness, and is under a doctor's care and/or taking medication. The question for this Court is whether, viewing this evidence in the light most favorable to Plaintiffs, Defendants could be said to have been not merely negligent, but rather deliberately indifferent to a known, substantial risk that Everage would commit suicide. The Court concludes that they cannot. This information conveyed to jail employees would not have "obviously" conveyed to them that Everage presented a substantial risk of suicide. Thus, neither they nor Jimenez and Villanueva

possessed the requisite mental state to constitute deliberate indifference. *See Cox*, 800 F.3d at 1254.

> 2. *Official Capacity Claims*

Plaintiffs' official capacity claims against Jimenez and Villanueva are merely another way of pleading an action against Grant County, the entity for which they serve as agents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). A county "can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alteration in original) (citations omitted). This type of claim requires "the plaintiff [to] prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009).

Here, the Court's decision regarding the claims against the individual defendants has mooted the question of Grant County's liability, because the Court has concluded that the individual employees—Maldonado, Mize, Jimenez, and Villanueva—did not violate Everage's constitutional rights. As a result, Grant County's policies cannot be the "moving force" behind any constitutional violation.


## II.   STATE LAW TORT CLAIMS FOR NEGLIGENCE, NEGLIGENT SUPERVISION, AND NEGLIGENT TRAINING (COUNTS III, V, AND VI)

Plaintiffs assert negligence claims against Defendants. However, as state government employees, Defendants enjoy sovereign immunity against such claims except to the extent such immunity is waived in the New Mexico Tort Claims Act ("TCA"), N.M. Stat. Ann. 41-4-1 et seq. Under the TCA, public employees acting within the scope of their duties are granted immunity for any tort except as waived by the Act. NMRA 1978, § 41-4-4(A). Here, Plaintiffs

claim that immunity is waived under § 41-4-12 of the TCA, which waives immunity for certain conduct by law enforcement officers while acting within the scope of their duties.

As a threshold matter, there is no dispute that the Defendants are "law enforcement officers" for purposes of the TCA, which defines "law enforcement officer" as an officer "whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes." § 41-4-3(D). Section 41-4-12 of the TCA waives the sovereign immunity of law enforcement officers for

> liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

Here, Plaintiffs argue that the waiver of immunity arises not from the commission of any of the intentional torts listed in the first part of § 41-4-12, but rather from the deprivation of Everage's constitutional rights. *See* Doc. 67 at 37. However, because the Court has found that Defendants did not violate Everage's constitutional rights, there is no waiver of immunity for Plaintiffs' negligence claims in Counts III, V, and VI. Accordingly, those claims will be dismissed.

In light of the foregoing,

**IT IS THEREFORE ORDERED** that *Defendants' Motion To Dismiss The Complaint For Failure To State A Claim, Or In The Alternative, For Summary Judgment* [Doc. 55] is hereby **GRANTED**. The Court will enter summary judgment in favor of Defendants Maldonado and Mize on the § 1983 claims in Counts I on II on the grounds that they are entitled to qualified immunity, and in favor of Defendants Jimenez, Villanueva, and Grant County on the grounds that there is no genuine issue of material fact. Further, the Court will enter summary judgment in

favor of all Defendants on Counts III, V, and IV on the grounds that they have sovereign immunity.

_____
**UNITED STATES DISTRICT JUDGE**